IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

STAND ENERGY CORPORATION,

Plaintiff,

v.

COLUMBIA GAS TRANSMISSION
CORPORATION, et al.,

Defendants.

CIVIL ACTION NO. 2:04-0867
consolidated with civil action nos:
2:04-0868; 2:04-0869; 2:04-0870; 2:04-0871
2:04-0872; 2:04-0873; 2:04-0874

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendants' Joint Motion to Dismiss. For the reasons that follow herein the Court **DENIES** the motions to dismiss for failure to state a claim based on the filed rate doctrine and preemption, **GRANTS IN PART** and **DENIES IN PART** the motion to dismiss based on failure to state a claim under antitrust law and common law claims.

**I.**
**Standard of Review**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defending party may move to dismiss if the pleading party has failed to state a claim for which relief may be granted. A Rule 12(b)(6) motion tests the sufficiency of the pleading. It does not resolve factual disputes, the merits of a claim, or the applicability of defenses. *Republican Party of North Carolina v. Martin*, 980 F.2d

943, 952 (4th Cir. 1992). In considering the motion, the claims must be viewed in the light most favorable to the non-moving party and all allegations accepted as true. *Id.* Dismissal is appropriate only when it appears beyond a doubt that no set of facts would entitle the pleader to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). The motion to dismiss for failure to state a claim is viewed with disfavor and rarely granted. *See Rogers v. Jefferson-Pilot Life Ins. Co.,* 883 F.2d 324, 325 (4th Cir. 1989) (reaffirmed in *Mylan Laboratories, Inc. v. Matkari,* 7 F.3d 1130, 1134 n.4 (4th Cir. 1993). *See generally* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* §§ 1356 and 1357 (1990 and 1998 Supplement).

## II.
## Factual Allegations and Procedural Background

Plaintiffs are eight shippers, wholesalers, and marketers of natural gas who transported and stored gas on the interstate pipeline systems owned by Columbia Gas Transmission Corporation, Columbia Gulf Transmission Company and Dominion Cove Point LNG, LP (Pipeline Defendants). Defendants fall into one of two groups. One group of defendants is the Pipeline Defendants who own pipelines used in the transportation and storage of natural gas. The other defendants are eight natural gas shippers (Select Shippers) whom Plaintiffs contend were given preferential treatment by the Pipeline Defendants.

Plaintiffs allege that the Pipeline Defendants granted preferential access to storage capacity and transportation on the interstate pipeline system to the Select Shippers in exchange for "kickback" payments. Specifically, Plaintiffs allege that the Pipeline Defendants allowed the Select Shippers to store gas on the pipeline system during the warmer months for resale during the colder months.

-2-

This allowed the Select Shippers to maintain a "positive imbalance" on the pipeline system. Along the same line, it is alleged that the Select Shippers were able to "borrow" gas off the pipeline system during the colder months for resale at a high price and replace the borrowed gas during the warmer months at a decreased price. Additionally, Plaintiffs contend that the Select Shippers were also given preferential transportation services. Plaintiffs argue that the scheme allowed Defendants to monopolize the market and resulted in "diminished revenues from sales to existing end-user customers, obstruction to business expansion, loss of market share and loss of asset value" to Plaintiffs. (Pls.' Resp. to Defs.' Mot. to Dismiss at 5).

In the fall of 1998, Columbia Gas Transmission Company (TCO) filed an application with the Federal Energy Regulatory Commission (FERC or Commission), seeking approval to operate a parking and lending service (PAL). The PAL service would allow shippers to park gas on the pipeline system as well as borrow gas from the pipeline system on an interruptible basis, which means it would be subject to interruption by higher priority shipping contracts. FERC approved TCO's application. Plaintiffs allege that subsequent to FERC's approval of the PAL license, the Pipeline Defendants continued their preferential treatment of the Select Shippers. Plaintiffs contend that though the Select Shippers accessed the inexpensive PAL service, the Pipeline Defendants continued to interrupt the higher priority shipping and transportation agreements of the Plaintiffs in favor of the interruptible agreements of the Select Shippers.

In February of 1999, TCO, Columbia Gulf Transmission Corp., and Columbia Energy Service Corp., voluntarily informed FERC of the gas imbalances which had occurred which Plaintiffs allege were a result of their preferential treatment of the Select Shipper Defendants prior to the 1998 PAL license. FERC instituted an investigation and in October, 2000, issued an Order

-3-

approving a Stipulation and Consent Agreement with TCO, Columbia Gulf, and Columbia Energy Services. As a result of the Stipulation and Consent agreement, TCO, Columbia Gulf, and Columbia Energy Services agreed to refund the Storage in Transit (SIT) penalties and disgorgement of profits to the industry participants whom FERC found had been illegally excluded from the scheme, which included many of the plaintiffs.

Plaintiffs originally filed this action alleging violations of state antitrust laws and breach of contract arising out of the conduct of Defendants in the Circuit Court of Kanawha County, West Virginia. Defendants properly removed the action to this Court pursuant to 28 U.S.C. §§ 1441 and 1446. Plaintiffs amended their complaint, after expedited discovery, to add the Select Shipper Defendants. Defendants subsequently filed the instant motion to dismiss Plaintiffs Second Amended Complaint (SAC) on numerous grounds. The Court will address each of Defendants arguments in turn.

## III.
## Analysis

### A.     Filed Rate Doctrine

Defendants assert that Plaintiffs' claims are barred by the filed rate doctrine. Under § 717b of the Natural Gas Act (NGA), transporters and sellers of natural gas in interstate commerce are regulated by FERC. 15 U.S.C. §717b. They must file their rates with the Commission and may charge only such rates as found by the Commission to be "just and reasonable." 15 U.S.C. § 717c(a). They may not grant any "undue preference or advantage," and they must file any change in their rates or services with the Commission in advance. 15 U.S.C. §§ 717c(b) and 717c(d). The Commission retains broad regulatory authority to determine the reasonableness of any rates or services. At its

-4-

core, the filed rate doctrine recognizes the authority extended to the Commission, and not the courts, to determine the reasonableness of the rates stated in the filing. *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577 (1981). The doctrine achieves two goals - restricting the regulated entity to charging only the approved rates and preserving the regulatory agency's authority to determine those rates. *Id.* at 577-78. *See also Bryan v. BellSouth Communications, Inc.,* 377 F.3d 424, 429 (4th Cir. 2004) ("The doctrine's purpose is two-fold: to prevent discrimination among consumers and to preserve the rate-making authority of federal agencies"). "It would undermine the congressional scheme of uniform rate regulation to allow a state court to award as damages a rate never filed with the Commission and thus never found to be reasonable within the meaning of the Act." *Arkansas Louisiana Gas Co.,* 453 U.S. at 579.

The doctrine applies to more than just rates; it extends to the services, classifications, charges, and practices included in the rate filing. *See* 15 U.S.C. § 717c(c)). Similar statutory provisions have been found to support applying the doctrine to services that may not literally involve rates or rate-setting. *AT&T v. Central Office Telephone, Inc.,* 524 U.S. 214, 233 (1998) (Stevens, J., dissenting). "Rates, however, do not exist in isolation. They have meaning only when one knows the services to which they are attached. Any claim for excessive rates can be couched as a claim for inadequate services and vice versa." *Id.* at 223. "In addition to barring suits challenging filed rates and suits seeking to enforce rates that differ from the filed rates, the filed-rate doctrine also bars suits challenging services, billing, or other practices when such challenges, if successful, would have the effect of changing the filed tariff." *Brown, III v. MCI Worldcom Network Services, Inc.,* 277 F.3d 1166, 1170 (9th Cir. 2002) (citing *AT&T v. Central Office,* 524 U.S. at 223).

The doctrine has been raised by Defendants as a bar to all of Plaintiffs' claims. They contend that Plaintiffs are attacking the tariff by claiming, first, that Defendants violated the tariff and its rate schedule and General Terms and Conditions, and, second, that the subsequently approved PAL service as part of the tariff violates Plaintiffs' rights. The Court has examined the SAC and the relief Plaintiffs seek in each cause of action. Plaintiffs claim that they suffered diminished revenues from sales to their customers, obstruction to business expansion, loss of market share, and loss of asset value.[1] The suit does not directly challenge the rates contained in Defendants' tariffs but asserts that Plaintiffs have been wrongfully injured by the Pipeline Defendants and the Select Shippers' conduct, for which Plaintiffs seek compensatory damages.

A claim for compensatory damages may implicate the filed rate doctrine where it has the effect of challenging the filed rate. *Hill v. BellSouth Telecommunications, Inc.*, 364 F.3d 1308, 1315 (11th Cir. 2004). Even though the complaint may not explicitly challenge the filed rate, the Court must consider whether the damages sought would effectively provide Plaintiffs with a different rate than the one contained in the tariff. "We therefore cannot permit any claim to go forward that, if successful, would require an award of damages that would have the effect of imposing different rates upon different consumers.... Similarly, authorizing a court to award damages that would effectively impose a rate different from that dictated by the tariff would usurp the FCC's [Federal Communications Commission's] authority to determine what rate is reasonable." *Bryan v. BellSouth*, 377 F.3d at 429-430.

---

[1]See SAC at ¶¶ 112, 170, 181, 206, 221, 234,243,251, 268, 278, 288, 299, and 309 for Counts One through Three and Five through Thirteen. Count Four, alleging unjust enrichment, seeks damages in the amount of profits earned by Defendants on sales Plaintiffs lost as a result of the alleged scheme.

-6-

The distinguishing element in the cases where the doctrine has been applied is the damages sought. Where plaintiffs seek damages based on the rates, the claims have been prohibited. In *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571 (1981), the Supreme Court framed the issue, stating, "[t]he question before us is whether that doctrine forbids a state court to calculate damages in a breach-of-contract action based on an assumption that had a higher rate been filed, the Commission would have approved it." *Id.* at 573. The Court agreed with the characterization that plaintiff's damage claim was "nothing less than the award of a retroactive rate increase based on speculation about what the Commission might have done..." *Id.* at 578-79. Damages for the breach of contract action based on assumptions as to what rate the Commission might have approved infringed on the powers of the agency, violating the doctrine. *Id.*

The Fourth Circuit applied this rationale in *Bryan*. There, the Court approached the filed rate doctrine by first explaining its rationale - preventing discrimination and preserving agency rate-making. *Bryan*, 377 F.3d at 429. It noted that a damage award would effectively lower that plaintiff's rates below that of other customers or require a court to determine a rate different from the filed rate. *Id.* at 430. Turning to the complaint before it, the Court concluded:

> In our view, the Complaint--read in the light most favorable to the plaintiff--nowhere purports to seek any form of damages other than a refund of some portion of the FUSC [Federal Universal Service Charge]. And it pleads no facts that would put BellSouth on notice that Bryan intends to seek damages resulting from any injury other than paying the FUSC.

*Id.* at 431.

*Bryan* relied on *Hill v. BellSouth*, where the Eleventh Circuit decided a case arising in a similar context, the Federal Communications Act universal service fund charges. Finding the filed rate doctrine prohibited the state law claims, the Eleventh Circuit considered the two prongs of the

-7-

doctrine: nondiscrimination and nonjusticiability, and how they applied to plaintiff's claims. *Hill*, 364 F.3d at 1316. The court in *Hill* found the plaintiff's claim would violate the nondiscrimination principle because a damage award for excessive charges would result in a discounted rate for the services. *Id.* Additionally, the nonjusticiability principle would be violated because the court would be retroactively finding the filed rate unreasonable and ordering a new rate, an inappropriate judicial determination of the reasonableness of rates. *Id.* at 1317. Thus, claims seeking damages based on rates or services differing from those set in the tariff are barred by the doctrine.

The critical factor in the analysis is the nature of the damages sought by the plaintiff. With this understanding in mind, the Court comments on the cases cited by the parties to illustrate its analysis. Defendants rely on several cases which arose from the California energy crisis. In *Public Utility District No. 1 of Snohomish County v. Dynegy Power Marketing, Inc.*, 384 F.3d 756 (2004), the Ninth Circuit applied the filed rate doctrine to dismiss state law claims. The consumer utility sued wholesale electricity generators and traders for market manipulation which caused the utility to pay higher rates than a competitive market would require. *Id.* at 758. The court reasoned that the claims would ask the district court to determine "fair price" rates. *Id.* at 761. *Public Utility District No. 1 of Grays Harbor County Washington v. Idacorp, Inc.*, 379 F.3d 641 (9th Cir. 2004), reached a similar result, emphasizing that plaintiff's claims would depend on the district court's determination of what a fair price or rate should have been. *Id.* at 648. *Snohomish County* treats the antitrust claims in the same fashion that *Grays Harbor* handled contract claims. Whether antitrust, unfair practices, or breach of contract actions, the nature of the damages sought governs the application of the doctrine.

-8-

Defendants also rely on *Lockyer v. Dynegy, Inc.*, 375 F.3d 831 (9th Cir. 2004), but its application of the doctrine arises in a different context. The State of California challenged the terms of the tariff by seeking to impose civil penalties, which the court declared was the province of FERC and would effect an alteration of the rates set by FERC. *Id.* at 853. Defendants also submitted *In Re Western States Wholesale Natural Gas v. Centerpoint Energy, Inc.*, No. MDL 1566, CVS031431PMP(PAL) (Base File) (D. Nev. Apr. 8, 2005), which applied the doctrine but only after finding "to calculate the necessary damages.... this Court would be required to make a determination as to what a just or reasonable rate would have been..." *Id.* In these cases the damages claimed by the plaintiffs implicated the filed rates and, for that reason, were precluded.

The cases cited by Plaintiffs underscore the proper application of the doctrine. In *Brown v. MCI Worldcom*, the plaintiffs brought an action in federal court alleging the defendants over-charged. 277 F.3d at 1169. Finding federal subject matter jurisdiction because the Federal Communications Act (FCA) permitted customers claiming violations of a filed tariff to bring an action in district court, the court then addressed the filed rate doctrine. *Id.* at 1170. The plaintiff did not challenge the validity of the tariff. *Id.* at 1171. Rather, he claimed it was being violated, and the FCA explicitly allows such actions in federal court. *Id.* at 1171-1172.

> The filed-rate doctrine precludes courts from deciding whether a tariff is reasonable, reserving the evaluation of tariffs to the FCC, but it does not preclude courts from interpreting the provisions of a tariff and enforcing that tariff. If the filed-rate doctrine were to bar a court from interpreting and enforcing the provisions of a tariff, that doctrine would render meaningless the provisions of the FCA allowing plaintiffs redress in federal court.

-9-

*Id.* The NGA contains a similar provision allowing suits in federal court. 15 U.S.C. § 717u. The plaintiff in *Brown* claimed he was improperly charged multiple fees not provided for in the tariff. *Brown*, 277 F.3d at 1172 .

> Brown seeks merely to enforce the tariff. He does not claim that he was promised something outside the tariff and then denied it, as in *Central Office*. Nor does he claim that MCI had some obligation to him beyond the obligations set out in the tariff. Nor does he argue that the $10 fee, if authorized by the tariff, is unreasonable.

*Id.* (citations omitted). The filed rate doctrine did not preclude the suit. *Id.* The claims in *Brown* are analogous to those of the Plaintiffs here.

    *Gulf States Utilities Co. v. Alabama Power Co.*, 824 F.2d 1465 (5th Cir. 1987), also illustrates the distinction based on the damages sought and their effect on the tariff rates. To the extent a claim is premised on a theory that different rates would have been charged but for a breach of contract or other duty, the claim is barred. *Id.* at 1471. But claims which do not seek relief based on a rate different from that filed would not be precluded. *Id.* at 1471-72.

    For the purposes of discussion, Plaintiffs' claims may be divided chronologically: the "illegal 'parking and lending' service that TCO was not authorized to provide under its FERC-approved natural gas tariff" (SAC at ¶ 76) and the later use of the tariff -approved PAL service in a manner that violates Plaintiffs' rights. (SAC at ¶¶ 113-126). They first complain that the Pipeline Defendants provided certain preferences to the Select Shippers that were illegal - a PAL service not included in the tariff. This illegal scheme, Plaintiffs aver, kept their natural gas out of the market and allowed the Select Shippers greater access to the market, causing Plaintiffs to lose customers.

    Plaintiffs do not claim that they were entitled to participate in these preferences. Had that been their claim, the filed rate doctrine would likely preclude it. They could not claim entitlement

to services not included in the tariff any more than they could seek damages based on the rates they paid for the services received. Instead, they claim the off-tariff preferences displaced them from the market, resulting in the loss of revenue and business value.

After disclosure of these practices, Pipeline Defendants obtained approval from FERC to offer the PAL service but implemented it so as to perpetuate the advantage given the Select Shippers and the injury to Plaintiffs' business. As to this post-approval PAL service, their claim is even clearer. They argue that the Pipeline Defendants and Select Shippers have created a scheme to effectively deprive Plaintiffs of access to the transportation and storage services under their service agreements with the pipelines. In this regard, Plaintiffs seek to enforce the tariff. Plaintiffs make no complaint about the rates or services other than being denied the benefits of their service agreements and being injured by the unfair advantage purportedly given to the Select Shippers. They do not seek damages based on the rates they were charged or some hypothetical rate to be determined by the court. The filed rate doctrine does not bar their claims.

## B.    Preemption

Defendants also argue that Plaintiffs' state law claims should be dismissed because the claims are governed exclusively by federal law and thus are preempted. In support of its assertion, Defendants rely on the NGA, stating that in enacting the NGA Congress gave exclusive control of the "transportation and sale of natural gas in interstate commerce" to the federal government, specifically FERC. 15 U.S.C. § 717(b).

Generally, under the Supremacy Clause federal law can preempt state law in one of three ways. First, Congress can expressly state an intention to do so. *College Loan Corp. v. SLM Corp.,*

-11-

396 F.3d 588, 596 (4th Cir. 2005). Secondly, "[i]f Congress evidences an intent to occupy a given field, any state law falling within that field is preempted." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984). Finally, if Congress has not expressed such an intent "state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Id.* This third type of preemption is known as conflict preemption. *See Lockyer*, 375 F.3d at 849.

Defendants assert that in the present case Congress, through the NGA, has created a comprehensive scheme occupying the entire field of the sale and transportation of natural gas and thus the entire field is preempted. In support of its argument, Defendants again cite *Lockyer*, a case which arose out of the California energy crisis and dealt with the Federal Power Act (FPA). *Id.* The *Lockyer* court found that because the FPA delegates "exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce" to FERC and the plaintiff's claims would encroach on that authority, the plaintiff's claims were preempted. *Id.* at 849, 852 (quoting *Transmission Agency of California v. Sierra Pacific Power Co.*, 295 F.3d 918, 928 (9th Cir. 2002)). The *Lockyer* court began its analysis by discussing the broader underpinnings of preemption, particularly field preemption, and looking to Supreme Court precedent in *Silkwood v. Kerr McGee*. *Lockyer*, 375 F.3d at 849. In *Silkwood*, the Court considered whether the Atomic Energy Act completely occupied the field of nuclear energy. In its analysis, the Court carefully considered the legislative history of the controlling statute and found that though Congress intended to completely occupy the nuclear safety field, it did not intend to preempt all state tort actions. *See Silkwood*, 464 U.S. at 251-52. The Court further found that though the Nuclear Regulatory Commission has

-12-

exclusive authority to regulate safety matters, "Congress assumed that state law remedies, in whatever form they might take, were available to those injured by nuclear incidents." *Id.* at 256. Therefore, the plaintiff's claims for state punitive damages were not preempted. *Id.*

The Supreme Court later discussed the test for field preemption as it relates to the natural gas industry in *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 (1988). Explaining the test for field preemption, the Supreme Court noted in *Schneidewind* that "every state statute that has some indirect effect on rates and facilities of natural gas companies is not pre-empted." 485 U.S. at 308. In determining whether the effect of a state claim results in preemption, the Supreme Court articulated the following test:

> When a state regulation "affect[s] the ability of [FERC] to regulate comprehensively...the transportation and sale of natural gas, and to achieve the uniformity of regulation which was an objective of the Natural Gas Act" or presents the "prospect of interference with the federal regulatory power," then the state law may be pre-empted even though "collision between the state and federal regulation may not be an inevitable consequence."

*Id.* at 310 (quoting *Northern Natural Gas Co. v. State Corp. Comm'n of Kansas*, 372 U.S. 84, 91-92 (1963)). Defendants have not demonstrated that the relief sought for Plaintiffs' claims would interfere with FERC's regulatory authority. The consent decree and settlement do not purport to remedy Plaintiffs' claims, and there has been no showing that FERC is engaged in any proceedings that conflict with Plaintiffs' lawsuit.

Additionally, in *California v. Federal Power Commission*, 369 U.S. 482 (1962), the Supreme Court specifically addressed whether the Federal Power Commission (FPC) should proceed with a decision on a merger where there was a pending state court antitrust action challenging the validity of that very merger. *Id.* at 487. The Court, stating that "immunity from the antitrust laws is not

-13-

lightly implied," found that the FPC did not have exclusive authority over antitrust violations. *Id.* at 485, 487. Defendants have not established that FERC has such exclusive authority now.

When *Lockyer* and the precedents on which it relies, *Duke Energy Trading and Marketing, L.L.C. v. Davis*, 267 F.3d 1042 (9th Cir. 2001) and *TANC v. Sierra Pacific Power Co.*, 295 F.3d 918 (9th Cir. 2002), are examined in the context laid out above, they are distinguishable from the case currently before the Court. In *Duke Energy* the Ninth Circuit Court of Appeals considered whether the California governor was able to commandeer an energy supplier's "contractual rights to deliver electricity to public utilities within the state." 267 F.3d at 1045. The court found that the California governor's actions "directly nullif[ied]" a portion of the FERC approved tariff which "constituted an impermissible intrusion into FERC's territory." *Id.* at 1057. Similarly in *TANC*, the Ninth Circuit found that because the damages TANC sought from its state tort and property claims depended on a finding regarding the validity of a specific system for the transportation of electricity which had been expressly approved by FERC, the state claims were preempted. 295 F.3d at 928. Only FERC has the authority to modify the operation of the system which it approved. *Id.* Whether a state claim is preempted by field preemption hinges on the effect that claim will have on the authority of FERC over the industry.

Plaintiffs point out that the court in *Brown*, as discussed *supra*, allowed plaintiff's state breach of contract claims to go forward despite that the terms of the contract were dictated by the tariff. 277 F.3d 1166. The court in *Brown* focused its analysis on the filed-rate doctrine rather than field preemption; however, this Court finds it interesting that field preemption was not even addressed. The court in *Brown* allowed state claims to go forward in a field that was comprehensively regulated and in which the regulatory authority, the FCC, had the power to hear

-14-

claims similar to those brought by the plaintiff. It is instructive that field preemption was not found to be a bar.

Plaintiffs in the present case do not make any state claims which directly affect FERC's authority to "regulate comprehensively" nor do they present "the prospect of interference with the federal regulatory power." *Schneidewind,* 485 U.S. at 310. Instead, Plaintiffs simply seek damages for the business they contend they lost as a result of Defendants' actions. Taking all of Plaintiffs' allegations as true, the Court finds that Defendants did not provide a convincing argument that Plaintiffs' claims interfere with FERC's regulatory authority to support dismissal based on field preemption.

## C.    Anti-Trust and Common Law Claims

Defendants also challenge the sufficiency of Plaintiffs' antitrust claims, asserting that Plaintiffs do not, and cannot, state facts necessary to support the elements of these claims. The SAC includes ten antitrust claims, Counts Four through Thirteen, which allege state and federal antitrust law violations. First, Defendants' motion to dismiss argues that Plaintiffs alleged only FERC violations, which are inadequate to state antitrust violations and failed to allege an "injury to competition." Second, Defendants argue that Plaintiffs lack standing as to some of their claims. Last, Defendants argue that Plaintiffs' horizontal conspiracy claims in Counts Eleven and Thirteen contain insufficient conclusory allegations.

Defendants attack the Plaintiffs reliance on violations of FERC regulations alleged throughout the SAC. Citing *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398 (2004), Defendants contend that Plaintiffs' "refusal to deal" claims cannot survive.

-15-

In *Trinko* the Supreme Court noted that the 1996 Telecommunications Act imposed new duties requiring a regulated company to deal with its competition. *Id.* at 401. Generally, a refusal to cooperate with rivals is a matter of right, but there are limited exceptions. *Id.* at 408. Where that refusal to cooperate is predicated on anticompetitive goals, antitrust law may restrict the right. *Id.* In determining whether the exception applied in *Trinko*, the Court reviewed several factors considered in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) and *Otter Tail Power Co. v. U.S.*, 410 U.S. 366 (1973). The "existence of a regulatory structure designed to deter and remedy anticompetitive harm" significantly reduces the need to apply traditional antitrust principles. *Trinko*, 540 U.S. at 412. The Court explained at some length the regulatory framework imposed by the FCC to provide competition access in that setting, in new wholesale market created by the regulatory scheme pursuant to an act "more ambitious than the antitrust laws... 'to eliminate the monopolies.'" *Id.* at 415 (quoting *Verizon Communications Inc. v. FCC*, 535 U.S. 467, 476 (2002)). *Trinko* reaffirms *Otter Tail* and *Aspen Skiing*, even though it acknowledged the limits of antitrust liability. Though FERC regulates the rates for transporting and selling natural gas in interstate commerce, Defendants have not demonstrated that this case involves the same level of regulatory overlay and unique market found in *Trinko*.

The Court finds *Otter Tail* more closely on point. There, the Supreme Court applied antitrust laws despite the authority of the Federal Power Commission. *Otter Tail*, 410 U.S. at 374-75. "Repeals of antitrust law by implication is disfavored." *Id.* at 372 (quoting *U.S. v. Philadelphia National Bank*, 374 U.S. 321, 350-51 (1963)). There, the regulatory scheme did not explicitly take into account antitrust considerations. The Court found Otter Tail's use of its monopoly power violated antitrust law. *Id.* at 377. Here, FERC's authority to remedy anti-competitive behavior is

-16-

decidedly less than the regulatory authority in *Trinko*. FERC's order provided relief limited to disgorging the Pipeline Defendants' ill-gotten profits and a small rebate of SIT fees, neither of which purported to address any anticompetitive results of the scheme.

Further, the SAC joins the Pipeline Defendants and Select Shippers as actors in concert claiming an "illegal agreement" (SAC at ¶¶ 40-42) between them to violate antitrust laws and FERC regulations. Characterizing the Select Shippers as their competitors, Plaintiffs, nonselect shippers, contend that the scheme falls within the "concerted action" cases noted by Footnote 3 in *Trinko* as presenting "greater anticompetitive concerns." *Trinko*, 540 U.S. at 410. *Trinko* does not alter the applicability of traditional antitrust principles to the Defendants in this case.

Next, Defendants argue that the SAC fails to allege an "injury to competition." They contend that any antitrust claim must allege a restriction in the output of some good or service. In Defendants' view, Plaintiffs allege only a loss of market share due to the preferential treatment afforded the Select Shippers in return for the "kickback" payment made to the pipelines.

In ruling on a motion to dismiss, the Court must ascertain whether the complaint covers all of the elements that comprise the theory for relief. *Estate Construction Co. v. Miller & Smith Holding Co.*, 14 F.3d 213 (4th Cir. 1994). "Injury to competition," is an essential element of every antitrust claim. An antitrust claim must assert that a defendant's conduct constitutes an unreasonable restraint of trade, not merely an economic injury to the plaintiff. *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508 (4th Cir. 2002). Defendants argue that the SAC fails to allege injury to competition because Plaintiffs do not allege and cannot show that Defendants' conduct resulted in a reduction in output. Defendants posit that Plaintiffs cannot demonstrate that the

-17-

conduct alleged caused any reduction in natural gas flowing into the market. In fact, Defendants point out, the SAC alleges that the Pipeline Defendants increased their storage capacity to accommodate greater quantities of gas from the Select Shippers. A shift in the market shares between the nonselect and select shippers, alone, would support only a finding of injury to a competitor. Plaintiffs respond by disputing whether a reduction in output is the test for injury to competition, but also argue that the SAC sufficiently alleges an injury to competition anyway.

A fair reading of the SAC supports the denial of Defendants' motion. Plaintiffs allege that Defendants' manipulation of the parking and lending service blocked the nonselect shippers from access to the pipelines. Excluding the nonselect shippers from the marketplace allowed the Select Shippers, acting in concert with the Pipelines, to take over the market and led to higher prices to retail customers. Plaintiffs assert that more than simply units of natural gas were blocked from the pipelines; their services and other attributes were also prevented from reaching their customers and others in the market. At this stage, the Court is reluctant to require more. Finding a restriction in output is a complex matter which requires a determination of the relevant market and a means of measuring output. *See* VII Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1503 (2003); XI Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1901(d) (2005). Here,

> ...it is enough to note that "output" is not always a clear concept. Even when we define it readily, it is usually difficult to observe. Many alleged restraints are examined before they have had time to work their results. And the longer a restraint has ben in effect, the greater is the impact of changes in supply, demand, and other market forces. We are often unable to disentangle the effects of challenged conduct. That is the reason we are so often forced to turn to surrogate for actual effects.

VII Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1503 (2003).

The Fourth Circuit applied the "rule of reason" test in *Continental* and *Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002), and each case is relied upon by the parties to support their divergent analyses. Assuming that test applies to Plaintiffs' claims, the Court cannot conclude that Plaintiffs' SAC fails to state a claim.[2] The discussion in *Continental* does not support Defendants' argument that a reduction in overall output, as opposed to an increase in price, is necessary to prove injury to competition. In *Continental* the competing airlines at Dulles Airport disputed the effects of templates used to control carry-on baggage. 277 F.3d at 502. Applying the "rule of reason" analysis, the Fourth Circuit discussed that if the template program restricted Continental's passengers from bringing carry-on baggage to the gates then a reduction in output, and therefore a restraint on trade, would be established. *Id.* at 515. The Court did not require a showing that fewer passengers departed at Dulles or even that fewer passengers chose Continental. *Id.* The Court noted that "Continental unquestionably incurred costs" in its effort to provide, as an alternative, a means of bypassing the templates. *Id.* The Court did not elaborate in its discussion of a restraint in trade based on restraining output but went on to state, "[i]f Continental cannot show any effect on price or output, then it has shown only that it incurred costs in hiring people to lift templates." *Id.*

The Court also finds the discussion in *Dickson*, although limited, to be of help. 309 F.3d 193 (4th Cir. 2002). In *Dickson* the Fourth Circuit stated that, "[a]iding the maintenance of a monopoly theoretically could harm competition by affecting price and/or output in various ways." *Id.* at 206. The Court theorized that potential harm to consumers would occur if rivals were foreclosed from

[2]Defendants suggested application of the rule of reason test in footnote 21 to their Joint Reply in Support of Defendants' Joint Motion to Dismiss for Failure to State a Claim, and Plaintiffs rely on *Continental* and *Dickson*, both of which applied the test.

access to consumers, denying competitive choices and allowing higher prices by the monopolist. *Id.* Increased prices and decreased access to consumers for rivals in the market are exactly what Plaintiffs allege here. To the extent that the "rule of reason" test applies to Plaintiffs' claims, the Court cannot conclude that Plaintiffs' SAC fails to state a claim.

Defendants next challenge Plaintiffs' standing to assert antitrust claims based on price fixing. In the SAC Plaintiffs allege that the Select Shipper Defendants, utilizing the advantages they obtained from their preferetial deal with the Pipeline Defendants, fixed their prices at just below Plaintiffs' to maximize their profits and avoid detection. Plaintiffs do not allege predatory pricing. Citing *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990), Defendants assert that competitors do not have standing to raise price-fixing antitrust claims. Competitors are not injured by mere price fixing whether the conspiracy sets maximum or minimum prices. *Matsushita Electric Industrial Co., LTD., et al. v. Zenith Radio Corp.*, 475 U.S. 574, 584 n.8 (1986) ("Respondents therefore may not complain of conspiracies that, for example, set maximum price above market levels, or that set minimum prices at *any* level."); *See also Atlantic Richfield Co.*, 495 U.S. at 336 (finding maximum price-fixing agreements illegal but not causing injury to competitors). Plaintiffs respond that their claims assert that Defendants' price-fixing was accompanied by exclusionary conduct. Even so, the alleged exclusionary conduct does not alter the requirements for standing to claim price fixing. To the extent Plaintiffs' antitrust claims rely on the allegation that Defendants set a price below Plaintiffs' prices, Plaintiffs lack standing as to that aspect of the claims. Insofar as any violation of antitrust laws is based on price-fixing, the Court **GRANTS IN PART** Defendants' motion to dismiss Counts Four, Five, Six, Nine, Ten, and Eleven.

The final objection to the SAC is that the state common law contractual counts fail to state a claim. Defendants argue that the breach of contract count fails to identify sufficiently any particular contract. However, Plaintiffs refer explicitly to the tariff's General Terms and Conditions and the service agreements between them and the Pipeline Defendants.

Defendants argue that West Virginia law does not recognize an independent cause of action for a breach of duty of good faith and fair dealing separate and apart from a breach of contract claim. Although this Court cannot find any cases in West Virginia directly on point with the present case, this Court held in *Hoffmaster v. Guiffrida*, 630 F. Supp. 1289 (S.D. W. Va. 1986), that "[t]he law . . . implies a covenant of good faith and fair dealing in every contract for purposes of evaluating a party's performance of that contract." *Id.* at 1290. In other jurisdictions, this implied covenant is subsumed in the contract claim and cannot be pled as an independent cause of action. *See, e.g., Estrin v. Natural Answers, Inc.*, 103 Fed. Appx. 702, 705, 2004 W.L. 1444956 at *3 (4th Cir. 2004) (unpublished) (finding the district court did not err in dismissing a counterclaim for a breach of good faith and fair dealing because a separate claim is not recognized under Maryland law); *Harte-Hanks Direct Marketing/Baltimore, Inc. v. Varilease Tech. Fin. Group, Inc.*, 299 F. Supp.2d 505, 518 (D. Md. 2004) (finding that under Michigan law a plaintiff may state a claim for breach of contract based upon an implied duty of good faith and fair dealing, but a breach of that "duty does not supply an independent cause of action where the plaintiff already is alleging breach of contract"); *RoTec Serv., Inc. v. Encompass Serv., Inc.* 597 S.E2d 881, 883-84 (S.C. App. 2004) (agreeing with courts interpreting Georgia, Illinois, New York, and South Dakota laws that state an implied covenant of good faith and fair dealing does not provide an independent cause of action that is separate and apart from a breach of contract claim). Given these cases and this Court's prior consistent pronouncement

-21-

in *Hoffmaster*, the Court agrees with Defendants and **DISMISSES** Plaintiffs' independent cause of action for good faith and fair dealing.

Defendants also question how Plaintiffs can allege breach of contract and unjust enrichment, a form of restitution arising from implied contracts and generally precluded by an express contract. Plaintiffs insist this count is in the alternative and permitted despite the inconsistency. At this stage, the Court has not determined whether the contracts identified by Plaintiffs apply to the course of dealing alleged by the SAC. Plaintiffs are entitled to claim alternative theories. Further, while no implied contract may conflict with terms of an express contract, where the express contract between parties does not apply or subsequent conduct not covered by the express contract may support an implied agreement, unjust enrichment may be asserted. 66 Am Jur 2d, Restitution and Implied Contracts, §§ 6 and 7 (1973).

## IV.
## Conclusion

For the reasons stated, the Court **DENIES** Defendants' Joint Motion to Dismiss for failure to state a claim based on the filed rate doctrine and field preemption; **DENIES IN PART** Defendants' Joint Motion to Dismiss for failure to state a claim under antitrust law; **GRANTS IN PART** Defendants' Joint Motion to Dismiss for failure to state a claim under antitrust law to the extent Plaintiffs' claim is based upon price-fixing; **DENIES** Defendants' Joint Motion to Dismiss for failure to state a claim under common law breach of contract and unjust enrichment; and **GRANTS** Defendants' Joint

Motion to Dismiss for failure to state a claim as it relates to Plaintiffs' independent cause of action for good faith and fair dealing.

The Court **DIRECTS** the Clerk to send a copy of this written opinion and order to counsel of record and any unrepresented parties.

ENTER: 6/14/05

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

-23-