## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

STAND ENERGY CORPORATION, et al.,

                Plaintiffs,

v.                                 CIVIL  ACTION  NO. 2:04-0867

COLUMBIA GAS TRANSMISSION
CORPORATION, et al.,

                Defendants.

### MEMORANDUM OPINION AND ORDER

Pending before this Court is Plaintiffs' Renewed Motion for Class Certification, Appointment of Class Representatives, Appointment of Class Counsel, and Approval of Notice of Class Action (Doc. 678).[1]  For the reasons below, the Court **DENIES** the motion. The Court also **DENIES as moot** Defendant's Motion to Exclude Testimony of Plaintiffs' Class Certification Expert (Doc. 698).[2]

### Facts

Plaintiffs originally filed suit in July 2004 against two groups of Defendants – Pipeline Defendants and Shipper Defendants – based on an allegedly illegal scheme involving the

---

[1]Plaintiffs' original Motion for Class Certification, Appointment of Class Representatives, Appointment of Class Counsel, and Approval of Notice of Class Action was filed on December 1, 2005 (Doc. 452).  As the parties filed updated documents in light of discovery, the Court **DENIES** the original motion **as moot**.

[2]For the purposes of the Motion for Class Certification, the Court considered and accepts the Plaintiffs' expert opinion but finds nonetheless that his opinions did not justify class certification.

transportation and storage of natural gas.  Defendants properly removed to this Court in August 2004.  On October 22, 2004, Plaintiffs filed a Second Amended Complaint ("SAC") alleging a number of causes of action, all of which are based on the "illegal scheme."  In December 2005, Plaintiffs filed a Motion for Class Certification, Appointment of Class Representatives, Appointment of Class Counsel, and Approval of Notice of Class Action.  Plaintiffs, who are competitors with the Shipper Defendants, seek recovery for themselves and the proposed class of natural gas marketing companies for breach of contract by Columbia Gas Transmission Corporation ("TCO") and for unjust enrichment and violations of state and federal antitrust statutes against all defendants.

After a hearing with the parties, the Court modified the scheduling order to allow the parties to complete discovery prior to considering the class certification and related issues.  On November 19, 2007, Plaintiffs filed the Renewed Motion for Class Certification, Appointment of Class Representatives, Appointment of Class Counsel, and Approval of Notice of Class Action (Doc. 678) at issue in this Order.  In addition to their responses, Defendants filed a Motion to Exclude Testimony of Plaintiffs' Class Certification Expert (Doc. 698).  The Court then heard oral arguments on the issues involved in the Renewed Motion for Class Certification.

In brief, Plaintiffs allege an illegal scheme in which TCO provided illegal storage and transportation services to its own marketing affiliate and to certain other natural gas shippers (select shippers) in exchange for "kickback payments."  The illegal scheme, as alleged by Plaintiffs, consists of agreements in which TCO and Columbia Gulf Transmission Company ("Columbia Gulf"), TCO's sister affiliate, permitted the select shippers to engage in "off-tariff" transactions in exchange for the

kickback payments.[3]  Of the original eight select shippers, four are the Shipper Defendants in this suit: Dynegy, Inc., Virginia Electric and Power Company, El Paso Merchant Energy, L.P., and Base Petroleum, Inc.[4]  The Court will describe the industry and allegations in further detail below.

**Gas Marketing Industry**

To understand the allegations, the Court accepts Plaintiffs' description of the natural gas marketing industry.  The interstate sale and transportation of natural gas is heavily regulated by the Federal Energy Regulatory Commission ("FERC"), which was granted jurisdiction by the Natural Gas Act ("NGA").  Under the NGA, interstate pipeline companies must file tariffs with FERC, specifying the rates charged for each gas storage and transportation service.  The tariffs must also include the General Terms and Conditions pursuant to which the pipeline companies are required to operate and a rate schedule for each service.  Transportation services for gas may be characterized as "firm" or "interruptible."  Firm transportation service means that the pipeline guarantees delivery at a certain time and place; the service will not be stopped or interrupted.  Interruptible service means that the transportation and delivery can be stopped or delayed for a variety of reasons; there is no guarantee that the delivery will take place at a certain time or place. Whether the service is firm, interruptible, or something less, directly affects the cost of the services and the market value of the gas.

---

[3]Plaintiffs alleged that to perpetrate the scheme, TCO later convinced two other pipeline companies to participate because their pipeline systems interconnected with TCO's interstate pipeline system. TCO and Columbia Gulf later involved Dominion Cove Point LNG, L.P. f/k/a Cove Point LNG L.P. in the alleged scheme as they needed more pipeline to free up capacity. Cove Point has since been voluntarily dismissed by Plaintiffs.

[4]Dynergy Inc. is a holding company which through Dynergy Marketing and Trade engaged in the alleged conduct.

During the mid-1980s, FERC issued several orders to deregulate the natural gas industry and create a market for independent gas marketing companies. FERC Order 436 provided that pipeline companies which offered open access transportation on a first come, first served basis would receive blanket certificates allowing them to enter into transportation agreements with shippers without prior FERC authorization. Pipeline companies that did not offer open access transportation could only resell gas they purchased from producers. FERC Order 436 made it easier for companies to purchase gas directly from producers rather than from pipelines, and then purchase transportation from the pipeline to move the gas to market.

In 1992, FERC issued Order 636, which required interstate pipelines to separate their gas sales and transportation services. Its purpose was to ensure that the gas of other suppliers could receive the same quality of transportation services as pipeline companies utilized for their own gas sales. Order 636 also allowed companies that held pipeline transportation and storage capacity to release any surplus capacity by selling that capacity. This significantly affected local distribution companies ("LDCs") because LDCs are required by state law to purchase large amounts of firm storage and transportation to cover worst case cold weather conditions. LDCs previously had to retain those capacities even after it was clear they would not be needed. Based on Order 636, those LDCs could sell the unneeded storage capacity to independent marketers. Any company that wants to release some or all of the surplus capacity (whether transportation or storage capacity) must post the capacity on the pipeline's electronic bulletin board ("EBB") for sale on an equal basis to all pipeline customers. The company that purchases the released capacity "stands in the shoes" of the original holder of that capacity.

The released capacity includes both released firm storage and released firm transportation. Obtaining released firm storage capacity allows a gas marketer to deliver gas to their end user customers even when there is congestion that prevents gas injections into the system. Obtaining firm transportation capacity allows a gas marketer to move gas from storage to its end users even when all interruptible transportation is interrupted.

Firm Transportation Service ("FTS") agreements with the pipeline specify the volume of gas subject to the agreement, the receipt points on the pipeline where the gas can be received into the system, and the delivery points on the pipeline where the gas can be delivered out of the system to the market. The points referred to in the agreement are "primary" points, but FTS agreement holders can also receive gas or deliver gas out of secondary points, which are not identified in the FTS agreement. However, transactions using the primary points have priority over transactions using the secondary points. If the pipeline has capacity that is left over after all of the firm primary and firm secondary transactions, the remaining capacity is made available for interruptible services.

Natural gas marketers use service agreements with pipeline companies in order to nominate receipts of gas into the system and deliveries out of the system. Gas marketers also nominate gas in and out of various storage and pooling accounts. The shipper lists the nominations on the pipeline's EBB stating the service used, the date of service, the volumes of gas, and the receipt and delivery points.

Pipelines also post notices on the EBB when lower priority "interruptible" services are interrupted or curtailed in favor of the higher priority "firm" services. If the services are curtailed, but not completely interrupted, the EBB notice indicates which portion of each shipper's nominated gas is permitted to flow. This usually occurs during cold weather periods because that is when

pipeline service demand increases.  If the pipeline company determines that there is not enough gas in the system to meet the pipeline's obligations to its customers using firm service contracts, the pipeline can issue an Operational Flow Order ("OFO") that requires all customers with negative imbalances in their accounts to flow gas into the system so that they balance their accounts – thereby eliminating their imbalances.

**TCO, Columbia Gulf, and the Select Shippers in the Gas Marketing Industry**

TCO has interstate natural gas pipeline that provides gas storage and transportation services in Kentucky, Tennessee, West Virginia, Virginia, Ohio, North Carolina, Pennsylvania, Maryland, Delaware, New Jersey, and New York.  In addition to its interstate natural gas pipeline system that provides both storage and transportation services, TCO also has 33 gas storage facilities for customers.  TCO's pipeline system is divided into operating areas, which are further divided into marketing areas.  Each market includes points where gas is received into the system (receipt points) and points where gas is delivered out of the system (delivery points).  Columbia Gulf is an affiliate of TCO that has an interstate natural gas pipeline which runs from the Gulf of Mexico to Leach, Kentucky, where it connects with TCO's pipeline system.

Both TCO and Columbia Gulf post their tariffs on the FERC website.  The tariffs consist of both the General Terms and Conditions under which TCO and Columbia Gulf operate and the rate schedules that describe each storage and transportation service.  They provide primary firm, secondary firm, and interruptible services.

Including the original eight, some forty-three select shippers participated in the scheme, according to Plaintiffs. Many of these select shippers participated only for a limited period of time. Some went out of business during the existence of the scheme; others entered later, after some class

members left the market.  Like the Plaintiffs' class, the select shippers operated in differing geographic areas; some only in local markets, others regionally.  As mentioned above, only four of the select shippers are now defendants in this action.

**Parking and Lending Scheme**

In oral arguments, Plaintiffs explained the scheme that is the target of their SAC.  Plaintiffs described that, as explained above, FERC requires that any services offered by the pipeline must be posted publicly on an EBB and must be made available to all gas marketers on the pipeline system on an equal access, nondiscriminatory basis.  Plaintiffs stated that, in this case, TCO provided what was effectively a firm storage service – "meaning that the gas was guaranteed to be stored from Point A in time to Point B in time in exchange for a profit-sharing arrangement that contemplated that the gas would be firm for that period of storage."  (Mot. Hr'g Tr. 6:15-19, June 3, 2008.)  Instead of making this available to all pipeline participants, TCO covertly funneled the capacity to eight select shippers.

Plaintiffs explained the "hierarchy" of services provided under TCO's tariff: firm services, interruptible services, and storage in transit.  Storage in transit ("SIT") is the lowest priority and "allows a shipper to store gas on a temporary basis on a pipeline.  The shipper must take the gas off the pipeline before the month expires; if it does not, there are penalties assessed for continuing to park or store the gas beyond thirty days."  (Hr'g Tr. 9:8-12.)  TCO, however, permitted the eight select shippers "to park their gas in the storage in transit account for long periods, as much as six or eight months, . . . and forgave the storage in transit penalties that normally would be assessed."  (Hr'g Tr. 9:14-17.)  TCO employed its SIT services from 1996 until early 1999.  The participants were permitted to have long-term imbalances of two types: park and loan.

Park Imbalances

One of the types of imbalances was a "park," meaning that they "would put gas into the SIT account and then let it sit there for long periods.  Typically, they would park it in the summer when the price of gas is cheap.  It would sit there until the cold weather period when they could make a big profit and sell the gas at the height of the cold weather season."  (Hr'g Tr. 10:6-11.)

In order to benefit from this park, the shipper would tell the pipeline, in advance, of its plan to park the gas in a summer month and take it off the system in a particular winter month.  They would then look at the New York Mercantile Exchange to find both the price of gas at the beginning of the park and the anticipated price at the end of the park.  Based on these numbers, they would estimate the profit from the long term firm storage arrangement and divide it on a percentage basis.  (Hr'g Tr. 10:12-24.)  TCO would take 90 percent of the anticipated profit and would receive that amount at the beginning of the deal.  The shipper earned the remaining 10 percent.

However, because the deals were for SIT accounts, which were interruptible, the shippers and TCO "had a secret arrangement that the gas could be moved over to" a virtual account called the Interruptible Paper Pool ("IPP").  (Hr'g Tr. 11:13-15.)  The IPP account "is where the imbalances would sit" and "the pipeline would permit the shippers to maintain imbalances on the IPP account."  (Hr'g Tr. 11:17, 11:25–12:1.)  In other words, the "SIT gas was laundered over to the IPP account, and then the select shippers could take that gas to the market from the IPP account" even though all other gas marketers were required to balance their IPP accounts on a daily basis by injecting gas if there was a negative imbalance and taking gas off if there was a positive imbalance.  (Hr'g Tr. 12:2-4, 12:6-12.)  Essentially, TCO was able "to convert the most interruptible service, SIT, into a firm service" because the gas imbalances "which normally couldn't sit in SIT were simply moved over

-8-

to an IPP account, which is where these. . . imbalances sat." (Hr'g Tr. 12:16-20.) This was very profitable for the select shippers because they were able to store the gas at a much cheaper rate in the summer and then sell it at peak prices in the winter. (Hr'g Tr. 12:21-25.)

Loan Imbalances

The other type of imbalances that took place were loan imbalances, also known as negative imbalances. There, the select shipper would approach TCO and ask to borrow gas from the system during the cold weather to sell when it is more profitable and they would offer to pay back the gas in the summer when the gas was cheaper. Therefore, "the shipper would run up a very negative imbalance in the IPP pool." (Hr'g Tr. 13:12-13.)

PAL/IPP Scheme

In the fall of 1998, TCO applied for a new rate schedule, "parking and lending," which was approved by FERC. According to Plaintiffs, the parking and lending ("PAL") schedule "seamlessly continued the same kind of imbalances" as the SIT/IPP deals. (Hr'g Tr. 16:6-7.) PAL replaced SIT as the lowest of all the rate schedules, with the lowest priority. However, TCO "continued precisely the same kind of long-term seasonable imbalance transactions, again coordinating the tandem use of the shippers' PAL, parking and lending service, with the IPP service. And, again, for the same reason, two services were needed." (Hr'g Tr. 16:12-16.) The PAL service would be the first to be interrupted, so TCO allowed the select shippers to move the gas from the PAL account over to its virtual IPP pool – which is where the large positive and negative imbalances would sit. (Hr'g Tr. 16:18-19, 17:3-7.) The gas that was in the IPP pool could be taken to market, whereas it could not be taken to market from the PAL account during periods of interruption. (Hr'g Tr. 17:11-13.)

Therefore, TCO again was able to convert the lowest priority service into a firm service that was only offered to certain shippers.  (Hr'g Tr. 17:15-17.)

<u>FERC Order</u>

After gaining FERC approval of the PAL schedule, TCO disclosed the SIT/IPP deals to FERC in February 1999.  In 2000, FERC issued a disgorgement order against TCO that covered the SIT period and revealed that the park and loan imbalance scheme was not made public and was offered only to the select shippers.  The FERC disgorgement order also indicates that TCO did not file accurate reports with the government which would have revealed the amount of gas stored and provided to the select shippers.  The stipulation of facts in the order included the SIT/IPP deals, the preferred shippers, and the profit sharing by TCO.

**Procedural Background**

Plaintiffs brought several causes of action.  First, Plaintiffs brought a claim of breach of contract against TCO, alleging that the Plaintiffs entered into various contracts with TCO for storage and transportation on TCO's pipeline system – including SIT service, firm transportation service, and interruptible transportation service – and that TCO breached those contracts as a result of the alleged illegal scheme described above.  Additionally, this cause of action contended that TCO violated provisions of the General Terms and Conditions of its natural gas tariff, also resulting in damages to Plaintiffs.  Second, Plaintiffs alleged breach of good faith and fair dealing against TCO based on its actions in conjunction with the alleged illegal scheme.  Third, Plaintiffs claimed unjust enrichment against all defendants based on the alleged illegal scheme.  Plaintiffs' fourth claim was vertical conspiracy in violation of Section 47-18-3 of the West Virginia Antitrust Act ("WVATA") against all defendants.  Count Five was a claim against the Pipeline Company Defendants of

horizontal conspiracy in violation of Section 47-18-3 of the WVATA; Count Six alleged the same against the Shipper Defendants.  Plaintiffs alleged in Count Seven and Count Eight that the Pipeline Company Defendants and Shipper Defendants, respectively, conspired to monopolize in violation of Section 47-18-4 of the WVATA.  In Count Nine, Plaintiffs brought a cause of action against all defendants for vertical conspiracy in violation of Section 1 of the Sherman Act.  Counts Ten and Eleven claimed that the Pipeline Company Defendants and Shipper Defendants, respectively, horizontally conspired in violation of Section 1 of the Sherman Act.  Finally, in Counts Twelve and Thirteen, Plaintiffs brought a cause of action against the Pipeline Company Defendants and the Select Shipper Defendants, respectively, for conspiracy to monopolize in violation of Section 2 of the Sherman Act.

Since the time of filing the suit, several of the original plaintiffs and defendants were dismissed from the suit and some of the claims have been dismissed as to certain defendants.  In October 2007, the Court dismissed Counts Six (horizontal conspiracy under state law), Eight (monopolization under state law), Eleven (horizontal conspiracy under the Sherman Act), and Thirteen (monopolization under the Sherman Act) against the Shipper Defendants.  Additionally, upon a Renewed Motion to Dismiss based on the United States Supreme Court's holding in *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955 (2007), Counts Five (horizontal conspiracy), Seven (monopolization), Ten (horizontal conspiracy under the Sherman Act), and Twelve (monopolization under the Sherman Act) of the SAC were dismissed against Dominion Cove LNG, LP, Dominion Cove Point Company LLC, Columbia Gulf, Columbia LNG Corporation, and CNLG Corporation.[5]

---

[5]On April 15, 2008, the parties stipulated dismissal of Dominion Cove Point LNG, LP, Dominion Cove Point Company, LLC, Columbia LNG Corporation, and CLNG Corporation.

Thus, the remaining claims are: 1) breach of contract against TCO; 2) breach of good faith and fair dealing against TCO for their contracts; 3) unjust enrichment against all defendants; 4) vertical conspiracy in violation of the WVATA against all defendants; and 5) vertical conspiracy in violation of the Sherman Act against all defendants.

As the suit remains now, the named Plaintiffs are: Stand Energy Corporation ("Stand Energy"); Energy Marketing Services, Inc.; AGF, Inc.; Advantage Energy Marketing, Inc.; 1564 East Lancaster Avenue Business Trust; and Nicole Gas Marketing, Inc. The remaining Defendants are TCO; Columbia Gulf; Base Petroleum, Inc.; Columbia Energy Services Corporation; Dynegy, Inc.; Virginia Electric and Power; and El Paso Merchant Energy, L.P.

Plaintiffs ask the Court to certify the class action on issues of liability and aggregate damages under Rule 23(c)(4) and to leave division of aggregate damages among plaintiff class members for post-judgment proceedings. Plaintiffs rely on Dr. Michael Harris to establish the premise of their class action certification motion. There were 436 marketers of natural gas using the TCO pipeline, and Plaintiffs' expert stated that the damages are readily calculable on a class-wide basis. Dr. Harris opined that the impact of the alleged anticompetitive conduct on the class members can be established by economic proof common to all class members. He calculated the difference in costs for TCO's services provided to select shippers participating in the scheme as compared to the costs imposed upon the class members. He concluded that TCO provided select shippers with preferential access to the pipeline and lower costs for transportation services than available to class members. Then, in offering his opinion that the scheme resulted in injury to competition, Dr. Harris stated that the market share for select shippers increased significantly and the class members' collective share decreased. He also pointed out the number of non-select shippers decreased over the period of the

scheme but that a large number of shippers entered and exited the market in between. Next, Dr.

Harris stated that class-wide profit margins declined, using an average per-unit profit margin which

he believes he can calculate based on aggregate data.

Dr. Harris did not determine the economic impact of each or any particular vertical

conspiracy. Rather, he relied entirely on aggregate data measuring the impact of all of the

conspiracies together, including the conduct of select shippers who are not parties to this action, and

constructed averages to depict the impacts. Dr. Harris' conclusions treat the plaintiffs' claims as a

combined conspiracy, not multiple, separate vertical conspiracies. Plaintiffs rely on the same

opinions for their claims of unjust enrichment against each Defendant. Dr. Harris did not provide

any analysis specific to any named select shipper defendant. Instead, Plaintiffs claim that proof of

the aggregate value of the scheme for all the select shippers, even non-parties, is permissible and that

the total benefit of the scheme for all the defendants can simply be divided pro rata among the class

members. (Pls.' Omnibus Reply 21.)

**Discussion**

**<u>Rule 23</u>**

Rule 23 of the Federal Rules of Civil Procedure establishes the requirements for a class

action:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Once a group meets the definition of Rule 23(a), Rule 23(b) specifies the types

of class actions permitted. For the purposes of this case, Plaintiffs argue that Rule 23(b)(3) is

-13-

applicable, so the Court will not detail the other types of cases permissible under Rule 23(b).  Rule

23(b)(3) provides that a class action can be maintained if,

> the court finds that the questions of law or fact common to class
> members predominate over any questions affecting only individual
> members, and that a class action is superior to other available
> methods for fairly and efficiently adjudicating the controversy.  The
> matters pertinent to these findings include:
>> (A) the class members' interests in individually controlling
>> the prosecution or defense of separate class actions;
>> (B) the extent and nature of any litigation concerning the
>> controversy already begun by or against class members;
>> (C) the desirability or undesirability of concentrating the
>> litigation of the claims in the particular forum; and
>> (D) the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3).

A class action "allows a representative party to prosecute his own claims and the claims of

those who present similar issues" and is "an exception to the general rule that a party in federal court

may vindicate only his own interests."  *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 318 (4th

Cir. 2006).  "Chief among the justifications for this device is its efficiency: adjudication of a

properly-constituted class action generally has res judicata effect and 'saves the resources of both

the courts and the parties by permitting an issue potentially affecting every [class member] to be

litigated in an economical fashion.'"  *Thorn,* 445 F.3d at 318 *quoting Califano v. Yamasaki,* 442 U.S.

682, 701 (1979).  The Fourth Circuit stated that to ensure that the benefits of class actions are

realized and "to protect both the rights of absent plaintiffs to present claims that are different from

those common to the class and the right of the defendant to present facts or raise defenses that are

particular to individual class members, district courts must conduct a 'rigorous analysis' to ensure

compliance with Rule 23, paying 'careful attention to the requirements of [that] Rule.'"  *Id.  quoting*

*General Tel. Co. of S.W. v. Falcon,* 457 U.S. 147, 161 (1982); *East Tex. Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 405 (1977).

In *Gariety v. Grant Thornton, LLP,* the Fourth Circuit clarified that the district court must take a "close look," conduct a "rigorous analysis," and make specific "findings" with respect to class actions. *Gariety,* 368 F.3d 356, 365 (4th Cir. 2004) *quoting Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615 (1997); *Falcon,* 457 U.S. at 161. District courts should not simply "accept the allegations of a complaint at face value in making class action findings." *Gariety,* 368 F.3d at 365. "At the class certification phase, the district court must take a 'close look' at the facts relevant to the certification question and, if necessary, make specific findings on the propriety of certification." *Thorn,* 445 F.3d at 319 *citing Gariety,* 368 F.3d at 365. "Such findings can be necessary even if the issues tend to overlap into the merits of the underlying case." *Id. citing Falcon,* 457 U.S. at 160. "The likelihood of the plaintiffs' success on the merits, however, is not relevant to the issue of whether certification is proper." *Id.* "[W]hile an evaluation of the merits to determine the strength of plaintiffs' case is not part of a Rule 23 analysis, the factors spelled out in Rule 23 must be addressed through findings, even if they overlap with issues on the merits." *Gariety,* 368 F.3d at 366.

> The analysis under Rule 23 must focus on the requirements of the rule, and if findings made in connection with those requirements overlap findings that will have to be made on the merits, such overlap is only coincidental. The findings made for resolving a class action certification motion serve the court *only* in its determination of whether the requirements of Rule 23 have been demonstrated.

*Id.*

As the Fourth Circuit stated, "we have stressed in case after case that it is *not the defendant* who bears the burden of showing that the class *does not comply* with Rule 23, but that it *is the*

*plaintiff* who bears the burden of showing that the class *does comply* with Rule 23." *Thorn,* 445 F.3d at 321 *citing Windham v. Am. Brands., Inc.,* 565 F.2d 59, 65 n.6 (4th Cir. 1977) (en banc).

As mentioned above, Plaintiffs here request class treatment of (1) liability, (2) injury and impact to the class, and (3) aggregate damages, leaving the division of damages among class members for further proceedings.[6]  Plaintiffs request bifurcation of a class action, with liability and aggregate damages decided in the first phase and distribution of the damages among class members in the second phase, in order to satisfy "important economies."  Under Plaintiffs' proposal, class representatives would prove the amount of damages for the whole class, so that there would be no need for individual damage proofs during the trial.  Additionally, they argue, the class action certification for liability and aggregate damages may promote settlement.

**Application of Rule 23(a) Requirements**

**Numerosity**

Plaintiffs argue that the class consists of 436 marketers, satisfying the numerosity requirement.  While Defendants contest the definition applied for determining the potential class

---

[6]Plaintiffs propose to define the class as follows:  "All purchasers, marketers, wholesalers, sellers and/or shippers of natural gas (except local distribution companies, shippers that ship gas solely for their own consumption) that had one or more service agreements with Columbia Gas Transmission Corporation ("TCO") and/or Columbia Gulf Transmission Company ("Gulf"), or which obtained rights to one or more of such service agreements by means of capacity release, or which used one or more of such service agreements held in the name of another as part of a joint venture, or the successor-in-interest to any of the aforementioned entities, from February 1, 1996 to May 31, 1999 (the "Class Period") and/or from June 1, 1999 to the present (the "Extended Class Period"), excluding shippers that participated in illegal gas imbalance transactions with TCO and Gulf during the Class Period and/or Extended Class Period."  Defendants argue that this definition is overly broad, in that it includes companies that are no longer in business or were not in business throughout the class period, as well as companies that received benefits from the "illegal scheme."

members, Defendants do not contest numerosity.  The Court therefore accepts that the numerosity requirement is fulfilled.

**Commonality**

"Commonality requires that 'there are questions of law or fact common to the class.' Fed.R.Civ.P. 23(a)(2).  The common questions must be dispositive and over-shadow other issues." *Lienhart v. Dryvit Systems, Inc.,* 255 F.3d 138, 146 (4th Cir. 2001) *citing Stott v. Haworth,* 916 F.2d 134, 145 (4th Cir. 1990).  "A question is not common, by contrast, if its resolution 'turns on a consideration of the individual circumstances of each class member.'" *Thorn,* 445 F.3d at 319 *citing* 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1763 (3d ed. 2005).  "In a class action brought under Rule 23(b)(3), the 'commonality' requirement of Rule 23(a)(2) is 'subsumed under, or superceded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over' other questions." *Lienhart,* 255 F.3d at 146 n.4 *quoting Amchem Prods., Inc.,* 521 U.S. at 609.

Plaintiffs argue that their antitrust claims satisfy the commonality requirement because elements of an alleged restraint on trade constitute common issues even when damages vary among class members.  Plaintiffs also argue that their breach of contract claims and unjust enrichment claims consist of common questions of law and fact: the existence of an illegal scheme, the duration of the illegal scheme, whether the illegal scheme violated the antitrust laws, whether the illegal scheme constituted a breach of contract by TCO with each of its gas transportation customers, whether the perpetrators of the illegal scheme were unjustly enriched, the fact of class-wide impact and injury, and the aggregate damage inflicted on the plaintiff class.

Defendants counter that there are different factual contexts among the class for all of these claims because of the market in which they and the class do business.  For instance, the receipt and delivery constraints on TCO's system are local and sporadic, presenting different factual scenarios for each transaction.  Defendants note that while some customers experience interruptions often, others are never interrupted, and the cause of that interruption "requires a close focus on a given place and time."  Thus, Defendants urge, there are a number of "potential causes, resulting effects, geography, weather, contract rights, and market conditions" that are not common to the plaintiffs. Additionally, because each plaintiff has a different contract, there can be no common "breach of contract" claim that is applicable to each plaintiff and defendant.

Courts frequently consider commonality and predominance together.  *Lienhart,* 255 F.3d at 146 n.4 *quoting Amchem Prods., Inc.,* 521 U.S. at 609.  The threshold for finding commonality is not high, and is generally subsumed in the analysis of predominance.  *Id.*  In this case, the parties and the Court focus on predominance.  The Court finds Plaintiffs' claims meet the commonality requirement.

**Typicality**

"The typicality requirement goes to the heart of a representative parties' ability to represent a class, particularly as it tends to merge with the commonality and adequacy-of-representation requirements."  *Deiter v. Microsoft Corp.* 436 F.3d 461, 466 (4th Cir. 2006).  The Fourth Circuit explained how the Court should approach typicality:

> The representative party's interest in prosecuting his own case must simultaneously tend to advance the interests of the absent class members.  For that essential reason, plaintiff's claim cannot be so different from the claims of absent class members that their claims would not be advanced by plaintiff's proof of his own individual claim.  That is not to say that typicality requires that the plaintiff's

-18-

> claim and the claims of class members be perfectly identical or
> perfectly aligned. . . . Thus, it follows that the appropriate analysis of
> typicality must involve a comparison of the plaintiffs' claims or
> defenses with those of the absent class members. To conduct that
> analysis, we begin with a review of the elements of plaintiffs' *prima
> facie* case and the facts on which the plaintiff would necessarily rely
> to prove it. We then determine the extent to which those facts would
> also prove the claims of the absent class members.

*Id.* at 466-67.  The *Deiter* court then described the specific elements required to prove the antitrust

claims and looked at "how proof of their claims would be typical of the proof of the claims of absent

class members."  *Id.* at 467.  The court stated that the typicality of the claims should not be general

and noted the specific differences among the proposed class members claims: agreements were

purchased by different methods, involved different products, and some parties negotiated a price

different from others.  *Id.* at 468.

      Here, Plaintiffs argue that their claims originate from the common nucleus of operative facts

and depend on the same legal theories – breach of contract, unjust enrichment, and violations of

antitrust laws.  Defendants respond by noting the generality with which Plaintiffs attempt to argue

typicality and point out that there are differing competitive contexts, including time and place.

Defendants also argue that there are different contracts at issue and any breaches of those contracts

would have occurred at a particular time and place and would involve particular shippers.

      The Court is satisfied that the claims of the representative plaintiffs are typical of the class.

While there are important differences, as discussed in the other sections of this opinion, typicality

is shown when the claims arise from the same legal theory and commonality is demonstrated.

*Deiter,* 436 F.3d at 467.

**Adequacy of Representation**

In *Broussard v. Meineke Discount Muffler Shops, Inc.,* the Court explained how the adequacy of representation element coincides with other elements of class consideration. *Broussard,* 155 F.3d 331 (4th Cir. 1998).

> As the Supreme Court has said, the final three requirements of Rule 23(a) 'tend to merge,' with commonality and typicality 'serv[ing] as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'

*Broussard,* 155 F.3d at 337 *quoting Falcon*, 457 U.S. 147, 157 n.13.  "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent."  *Amchem Prods., Inc.,* 521 U.S. at 625.  "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members."  *Id.  quoting Rodriguez*, 431 U.S. at 403.

One of the issues that arises in this case is the potential conflict of interest between the representative plaintiffs and members of the class.  Both the Supreme Court and the Fourth Circuit "have long interpreted the adequate representation requirement of Rule 23(a)(4) to preclude class certification" in circumstances where there is a conflict of interest with respect to the appropriate relief.  *Broussard,* 155 F.3d at 337.  "The Supreme Court 'has repeatedly held that a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'"  *Id.  quoting Rodriguez,* 431 U.S. at 403.  "The premise of a class action is that litigation by representative parties adjudicates the rights of all class members, so basic due process requires that named plaintiffs possess undivided loyalties to absent class members."  *Id.*

-20-

Plaintiffs state that all class members have been damaged by the same parking and lending scheme. The central issues of the case – the existence, scope, and effects of the defendants' illegal scheme – are common to the claims of the named plaintiffs and the class. Plaintiffs therefore argue that in proving their own claims, named plaintiffs necessarily will substantiate the claims of the plaintiff class. They assert that, collectively, the named plaintiffs have the financial means, in conjunction with their counsel, to pay for the publication of notices pertaining to this action and other reasonable and necessary expenses of the action, particularly in light of the anticipated expansion in the number of plaintiffs – pending the Court's certification. Finally, Plaintiffs state that they have retained counsel who will aggressively and competently prosecute, and who are well-qualified and committed.

Defendants respond that Plaintiffs lack standing to adequately represent the interests of all class members. In fact, Defendants note that all but one of the plaintiffs have been out of the business for several years. This means that those plaintiffs do not have standing "to complain about events occurring after they exited the gas marketing business." The only Plaintiff that does not have "this temporal problem" is Plaintiff Stand Energy which has been in the gas marketing business throughout the proposed class period. However, Defendants note that Stand Energy engaged in a PAL transaction with TCO that had features that their claims seek to condemn. Further, Defendants argue that it seems apparent that there may not be a named plaintiff for each vertical conspiracy, in which case there is not adequate representation for all the claims and the class members.

Defendants then argue that the interests among the plaintiffs will inherently and inevitably conflict since the proposed class members compete or used to compete with one another in the market. Defendants pointed out during oral arguments that one of the issues with this case is that

the damages relate to lost profits. This means that each plaintiff must show how much business it lost because of Defendants' actions and, in order to maximize its potential damages award, each plaintiff has an incentive to minimize the other plaintiffs' losses. Thus, as Plaintiffs claim that they were injured by TCO's limited capacity, each plaintiff and proposed class plaintiff utilized some of the capacity, thereby causing some amount of harm to each other plaintiff. In fact, to prove damages, each plaintiff will seek to prove how much business they could have obtained and how much they could have prospered as a business had Defendants' actions not stifled them. Additionally, Defendants note that there is conflict with determining whose profits were lost, and which conspiracy caused it. Some plaintiffs are no longer in business, some plaintiffs and defendants have been removed from this suit without explanation, and some select shippers are not party to the suit at all. Defendants argue that the named plaintiffs cannot adequately represent the interests of those class members whose injuries were caused by the conduct of nonparties. For these reasons, Defendants contend there are significant conflicts of interest among the Plaintiffs that could arise.

The Court finds that these conflicts of interest may inhibit the named plaintiffs from adequately representing the interests of the proposed class; therefore, the Court finds that the adequacy of representation element has not been established by Plaintiffs.

### Application of Rule 23(b)(3)

After reviewing the requirements of Rule 23(a), the Court must turn to Rule 23(b)(3).

> To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must "predominate over any questions affecting only individual members"; and class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy."

*Amchem Prods., Inc.,* 521 U.S. at 615 (citation omitted).  Thus, "Rule 23(b)(3) has two components: predominance and superiority.  The predominance requirement is similar to but 'more stringent' than the commonality requirement of Rule 23(a)."  *Thorn,* 445 F.3d at 319 *quoting Lienhart,* 255 F.3d at 164 n.4.  "Whereas commonality requires little more than the presence of common questions of law and fact, Rule 23(b)(3) requires that 'questions of law or fact common to the members of the class predominate over any questions affecting individual members.'" *Thorn,* 445 F.3d at 319 *quoting* Fed.R.Civ.P. 23(b)(3).  Superiority requires that a class action be "superior to other available methods for the fair and efficient adjudication of the controversy."  *Id. quoting* Fed.R.Civ.P. 23(b)(3).  Courts should consider the several factors listed in Rule 23(b)(3)(A), (B), (C), and (D) "in deciding whether a class action meets these two requirements."  *Id.*

**Predominance**

Predominance requires the proposed class be "sufficiently cohesive to warrant adjudication by representation." *Thorn,* 445 F.3d at 319 *quoting Amchem Prods., Inc.,* 521 U.S. at 623.  The purpose of the cohesiveness is to ensure that "[a]ny resultant unfairness to the members of the class [as a result of being bound by the action]" is "outweighed by the purposes behind class actions: eliminating the possibility of repetitious litigation and providing small claimants with a means of obtaining redress for claims too small to justify individual litigation."  *Rhodes v. E.I. du Pont de Nemours & Co.,* No. 6:06-cv-00530, 2008 WL 2400944 at *4 (S.D.W.Va. 2008) *quoting Barnes v. American Tobacco Co.,* 161 F.3d 127, 143 (3rd Cir. 1998).

Here, Plaintiffs assert breach of contract, unjust enrichment, and antitrust claims that arise from the illegal parking and lending scheme perpetrated by Defendants.  Plaintiffs argue that

common issues can predominate even if there are individualized damages and that predominance is readily found in antitrust cases.

Defendants respond that the plaintiffs cannot prove their injuries with class-wide proof. Defendants note that class members were in business for different time periods, that they had different contracts and differing services in different geographic regions, and that some members benefitted from the scheme at various points.  There is no way, Defendants contend, to determine individual impact on class members without "painstaking" individual inquiry.  Thus, Defendants urge, there is no predominance.  Defendants also note that there are individualized issues with determining standing, statute of limitations defenses, and equitable tolling.

Vertical Conspiracy Claims

Plaintiffs' complaint asserts both state and federal antitrust claims.  The West Virginia Supreme Court of Appeals recently clarified that the WVATA should be interpreted utilizing laws applicable to the Sherman Act.  *Kessel v. Monongalia County Gen. Hosp. Co.,* 648 S.E.2d 366, 375 (W.Va. 2007).[7]  Section 1 of the Sherman Act states, in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several

---

[7]"The primary distinction between W.Va. Code § 47-18-3(a) and Section 1 of the Sherman Act is that the West Virginia statute applies to contracts and conspiracies in restraint of trade 'in this State' while the federal statute is applicable to contracts and conspiracies 'in restraint of trade or commerce among the several States, or with foreign nations.'"  *Kessel,* 648 S.E.2d at 375.  The Court stated, "we must presume that the Legislature knew the scope of federal antitrust law and the terms of art utilized therein at the time it enacted the WVATA and directed its construction in harmony with federal law."  *Id.* at 376.  After reviewing precedents, the Court concluded that "policy considerations suggest following federal precedent for substantive offenses" under WVATA also.  *Id.* at 379.  The Court explained, "[w]ithout uniform construction between state and federal antitrust laws, businesses will have a difficult time predicting the antitrust implications of their business decisions. Enforcement of state and federal antitrust laws will also be aided by a policy of uniform interpretation."  *Id.*

States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.  Under the Sherman Act, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition." *State Oil Co., v. Khan,* 522 U.S. 3, 10 (1997) *citing Arizona v. Maricopa County Med. Soc.,* 457 U.S. 332, 343 (1982).  The United States Supreme Court clarified that Section 1 of the Sherman Act "prohibits only agreements that *unreasonably* restrain trade." *NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 133 (1998).  "[I]njury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny, 'since it is inimical to the antitrust laws to award damages for losses stemming from continued competition.'" *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334 (1990) *quoting Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 109-10 (1986).

"The necessary elements for recovery under section 1 of the Act are: (1) an agreement, conspiracy, or combination among defendants in restraint of trade; (2) injury to the plaintiff's business and property as a direct result; (3) damages that are capable of reasonable ascertainment and are not speculative or conjectural." *Wilder Enterprises, Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1139 n.1 (4th Cir. 1980).  The Fourth Circuit later broke down the first element into two separate factors, stating "[t]o establish a violation of § 1 of the Sherman Act, [Plaintiff] must prove the following elements: (1) a contract, combination, or conspiracy; 2) that imposed an unreasonable restraint on trade." *Dickson v. Microsoft Corp.,* 309 F.3d 193, 202 (4th Cir. 2002) *citing Oksanen v. Page Memorial Hosp.,* 945 F.2d 696, 702 (4th Cir. 1991).  A "mere finding of violation does not result in liability. The statute gives a right of action only to the extent that one has been 'injured in his business or property by reason of anything forbidden in the antitrust laws.'" *Windham,* 565 F.2d at 65-66 *quoting* 15 U.S.C. § 15.

The two main types of antitrust conspiracies are horizontal and vertical restraints of trade. *See e.g. Leegin Creative Leather Products, Inc. v. PSKS, Inc.,* —U.S.—, 127 S.Ct. 2705, 2713 (2007). A horizontal restraint "involves agreements between competing sellers or competing buyers." *Chuck's Feed & Seed Co., Inc. v. Ralston Purina Co.,* 810 F.2d 1289, 1294 n.2 (4th Cir. 1987). A vertical restraint,

> is one that is embodied in an agreement between a seller and a purchaser of a product, and which restricts the activities of the purchaser with respect to third parties. Any arrangement between a manufacturer and a dealer whereby a dealer agrees not to buy from certain third parties, not to sell to certain third parties, or not to sell in certain locations is a 'vertical' restriction.

*Id.* at 1294 n.2. "[H]orizontal agreements among competitors to fix prices or to divide markets" are "per se unlawful." *Leegin,* 127 S.Ct. at 2713 (citations omitted). However, courts have been reluctant "to adopt *per se* rules with regard to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *Leegin,* 127 S.Ct. at 2713 *quoting Khan,* 522 U.S. at 10. Because vertical restraints may benefit competition in some ways, the United States Supreme Court has held that a "rule-of-reason approach must be applied to vertical restraints" in determining whether they are lawful. *Chuck's Feed*, 810 F.2d at 1294 *citing Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 57-58 (1977); *see also Leegin*, 127 S.Ct. at 2712-13. "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Leegin*, 127 S.Ct. at 2712 *quoting Sylvania,* 433 U.S. at 49. "Appropriate factors to take into account include 'specific information about the relevant business' and 'the restraint's history, nature, and effect.'" *Leegin,* 127 S.Ct. at 2712 *quoting Khan,* 522 U.S. at 10.

The Fourth Circuit instructs the Court to use the "rule of reason" analysis when impact on competition is difficult to determine. *Dickson,* 309 F.3d at 205.  Under the rule of reason analysis,

> [t]he true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.  To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.  This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

*Dickson*, 309 F.3d at 206 n. 15 *quoting Bd. of Trade of City of Chicago v. United States,* 246 U.S. 231, 238 (1918).  "In the rule of reason analysis, 'the reasonableness of the restraint is evaluated based on its impact on competition as a whole within the relevant market.'"  *Dickson*, 309 F.3d at 206 *quoting Oksanen,* 945 F.2d at 708.  Looking at the impact on competition within the relevant market "requires a showing of 'anticompetitive effect' resulting from the agreement in restraint of trade.  To have 'anticompetitive effect' conduct 'must harm the competitive *process* and thereby harm consumers.  Harm to one or more competitors will not suffice.'"  *Id.* at 206 (citation omitted).  The Fourth Circuit referred to the purpose of the Sherman Act, stating that the Act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."  *Id.* (citation omitted)).  Thus, the Court directed that,

> an inquiry into the lawfulness of a restraint begins 'by identifying the ways in which a challenged restraint might possibly impair competition.'  After identifying the type of possible harm to competition alleged, we must proceed 'to determine whether that harm is not only possible but likely and significant, which requires examination of market circumstances,' including market power and share.

*Id. quoting* 7 Areeda & Hovenkamp ¶ 1503a, at 372. The Court also warned that "'[t]heorizing about conceivable impairments of competition does not, of course, prove that any such impairment has occurred or is likely,' or much less is 'substantial in magnitude.'" *Id.* at 207 *quoting* 7 Areeda & Hovenkamp ¶ 1503a, at 373.

Based on Plaintiffs' description, each individual shipper defendant entered into a separate contract with TCO to receive preferential rates for transportation and storage of gas. This amounts to a "rimless wheel conspiracy" in which "various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction." *Dickson*, 309 F.3d at 203. The United States Supreme Court and the Fourth Circuit have been clear about the rimless wheel conspiracy – namely, "a wheel without a rim is not a single conspiracy." *Id.* at 203-204 *citing Kotteakos v. United States,* 328 U.S. 750, 755 (1946).

Plaintiffs argue that because TCO is a pipeline with a finite amount of space, every Defendant who used the pipeline restricted Plaintiffs from that access. In oral arguments, Plaintiffs admitted that the defendants must be looked at individually, except Plaintiffs argued that TCO is at the hub of the spoke, so that "the aggregate injury inflicted on the market can be all laid at the feet of Columbia Gas Transmission, whether you're looking at it from the antitrust perspective or under" the unjust enrichment or breach of contract theories. (Hr'g Tr. 23:25-24:9.) Plaintiffs state that "the closed nature of this system means that the bad acts of one is going to hurt all the others and injure competition." (Hr'g Tr. 27:5-7.)

Defendants respond that even though there is a limited amount of space on the pipeline, it is impossible to determine which defendant restricted a particular plaintiff's access at a specific

-28-

point in time. Constraints on the capacity of the pipeline and interruptions in deliveries occur nearly constantly, based on weather, demand, equipment and other factors. Defendants state that there is no method for isolating whether a particular constraint was due to parking and lending that violate antitrust laws or simply the result of legitimate factors.

Here, to prove that Defendants' conduct produced adverse anticompetitive effects through illegal methods, Plaintiffs must show how each transaction adversely affected the plaintiff class. Plaintiffs argue that every action by every defendant inherently utilized some of the limited space on the TCO pipeline and therefore impacted all class plaintiffs. However, Plaintiffs must show which individual defendants and which of their transactions injured which individual Plaintiff in each instance – by time and location – to demonstrate that the conduct violated antitrust laws. Plaintiffs' expert, Dr. Harris, used averages and aggregate impact data based on the conduct of all select shippers. His opinions show the combined effects of the select shippers and TCO together, but these conclusions do not correspond to the separate vertical conspiracy claims. Plaintiffs may not rely on the collective effect of all the alleged conspiracies to prove the elements of each single conspiracy. The liability of each Defendant Shipper may not be based on the conduct of the other select shippers, few of which are even parties. These are individualized factual questions that cannot be resolved on a class-wide basis. To permit otherwise would effectively treat all the Defendants as conspirators responsible for the conduct of separate conspiracies. The Court thus rejects Plaintiffs' rationale.

Plaintiffs' claims of vertical conspiracies against the defendants place TCO at the "hub" of a "rimless wheel" with "spokes" consisting of more than forty select shippers, of whom four remain as defendants. To conclude that Plaintiffs' claims are not suitable for class action treatment, this

-29-

Court relies primarily on *Dickson*. *See generally Dickson,* 309 F.3d 193. In *Dickson,* as here, plaintiffs alleged more than one vertical conspiracy, with Microsoft as the "hub" defendant and two software manufactures, Compaq and Dell Computer, as the "spokes" which entered into separate agreements with Microsoft. The Court's analysis of the sufficiency of plaintiffs' allegations provides this Court with compelling guidance on the elements of a vertical restraint conspiracy. The *Dickson* Court's treatment of a "hub and spoke," or "rimless wheel," conspiracy applies to Plaintiffs' claims. Citing the United State Supreme Court's decision in *Kotteakos v. United States*, the Fourth Circuit observed that this type of conspiracy "is not a single, general conspiracy but instead amounts to multiple conspiracies between the common defendant and each of the other defendants." *Id.* at 203 *citing Kotteakos,* 328 U.S. at 768-69.

     *Dickson* rejected the notion, suggested in other circuits, that a "hub and spoke" conspiracy constitutes a single conspiracy under the Sherman Act because the "hub" is common to each conspiracy. The Court affirmed dismissal of plaintiffs' first complaint. Turning then to the amended complaint, the Court found plaintiffs sufficiently alleged an agreement (because the two vertical conspiracies were based on their separate licensing agreements) but considered whether plaintiffs sufficiently alleged the agreements resulted in an unreasonable restraint on trade. Applying the "rule of reason" test, the Court examined each agreement individually to test whether each conspiracy resulted in an unreasonable restraint on trade. For reasons which ring true here, the Court rejected plaintiffs' claims. In particular, the Court pointed out that each "agreement must be treated as a separate conspiracy, and only acts taken in furtherance of that alleged conspiracy are appropriately considered . . . not acts of one conspirator taken in furtherance of other possible, distinct conspiracies." *Dickson,* 309 F.3d at 211.

The lesson from *Dickson* applies to Plaintiffs' claims in this case. Each of the vertical conspiracies is a separate conspiracy and each must be demonstrated to result in an unreasonable restraint on trade. *See Dickson,* 309 F.3d at 210-11. Plaintiffs argue that here, unlike in *Dickson,* the "vertical conspiracies are identical" because they all involve parking and lending transactions and imbalances which have the same effect on all the participants in the market. TCO is a common player in each of the alleged conspiracies and therefore would properly be held liable for the aggregate of all the conspiracies shown at trial. Plaintiffs argue that because of the nature of the TCO system, each conspiracy, whether individual or aggregate, has the same impact. Plaintiffs attempt to distinguish *Dickson* based on the differences in the relevant markets, but acknowledge that their expert opined that the adverse impact of the vertical conspiracies *taken together* was an adverse impact on all class members. The anticompetitive effect of each conspiracy must be shown through individual proof. That proof must show how each conspiracy resulted in injury to competition. *Dickson,* 309 F.3d at 210 (stating that the court could not consider the cumulative harm of the hub's agreements, but instead was required to consider the agreements individually to evaluate each agreement's potential for anticompetitive effects). Plaintiffs offer evidence that the cumulative effect of all of these conspiracies was a decrease in the number of competitors and an increase in market shares for the select shippers. But this is a cumulative effect, not an analysis of the individual effect of each conspiracy on the market. Plaintiffs fail to demonstrate how any particular conspiracy resulted in injury to all class members.

To decide liability, individual inquiries would dominate the case. The jury would have to consider the individual circumstances of each contract and each transaction in the pipeline system. The jury would have to look at the individually claimed losses to figure out whether it was a true

"loss" or whether the pipeline usage at that particular time and place was pursuant to lawful conduct under the tariff. The existence and impact of each vertical conspiracy must be established independently. "[A] class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Broussard*, 155 F.3d at 345 *quoting Califano,* 442 U.S. at 700-01. "It is axiomatic that the procedural device of Rule 23 cannot be allowed to expand the substance of the claims of class members. Thus courts considering class certification must rigorously apply the requirements of Rule 23 to avoid the real risk, realized here, of a composite case being much stronger than any plaintiff's individual action would be." *Id.* at 345 *citing* 28 U.S.C. § 2072(b) (stating that the Federal Rules "shall not abridge, enlarge or modify any substantive right"). As in *Windham,* the factfinder would have to look at each individual sale and relate it to a particular alleged conspiracy, and then prove the injury to competition. *In re Fine Paper Antitrust Litigation*, 685 F.2d 810, 822 (3rd Cir. 1982) (stating that proof of the vertical conspiracies would vary among the class members and that the factual variations of those alleged vertical conspiracies were a reasonable basis for denying class certification).

Plaintiffs' aggregate damages claim is also problematic. Plaintiffs seek damages for lost profits on behalf of the class. They purport that the illegal scheme gave select shippers advantages which diminished the ability of the class members to compete, resulting in a lower volume of gas sales and concomitantly lower profits. Whether lost profit damages may be sought in a class action has been the subject of considerable debate. The Fourth Circuit has been cautious in allowing such damage claims to be certified for class action status.

The Fourth Circuit has found that "the need for individualized proof does not necessarily preclude class certification so long as common issues continue to predominate over individual

issues." *Lienhart*, 255 F.3d at 147 *citing Broussard*, 155 F.3d at 343.  However, "it is impermissible to determine damages on a classwide basis in order to facilitate class treatment of a case when the governing law requires individualized proof of damages."  *Id. citing Broussard,* 155 F.3d at 343. "This Court has further held that the need for individualized proof of damages may defeat predominance where proof of damages is essential to liability." *Id. citing Windham*, 565 F.2d at 66.

The *Windham* Court made clear that in antitrust claims, "[t]he gravamen of the complaint is not the conspiracy; the crux of the action is injury, individual injury.  While a case may present a common question of violation, the issues of injury and damage remain the critical issues in such a case and are always strictly individualized."  *Windham*, 565 F.2d. at 66 (citations omitted).

> Generalized or class-wide proof of damages in a private anti-trust action would . . . contravene the mandate of the Rules Enabling Act that the Rules of Civil Procedure 'shall not abridge, enlarge or modify any substantive right.' It follows that in determining manageability, the District Court must have in mind these essential elements of a private anti-trust action and the proof that may be required to establish these elements.

*Id. quoting* 28 U.S.C. § 2072.

In affirming that class treatment was not appropriate, the Fourth Circuit referred to the district court's reasoning for finding "that the issue of anti-trust violation did not predominate, that class action treatment was not superior to other available remedies in the case, and under the required standards of proof of the plaintiffs' action, class certification would render it unmanageable."  *Windham*, 565 F.2d at 66.  The Court noted the district court's finding that there would be a

> multiplicity of claimants who might be involved, the complexity of their claims as they would relate to injury and damages, and the highly individualized character the proof of injury and damages

-33-

> would assume, making necessary a mini-trial on all the individual
> claims, probably with a separate jury.

*Id.* at 66.   Additionally, the district court found that the claims could not be proved by a mathematical calculation and would require individual proof and trial.  *Id.* at 67. Both the Fourth Circuit and the district court noted that there would be differences in a single market area verses the over-all market area.  *Id.*  The Court discussed several different factors that the district court would have to consider:

> In calculating any potential party's claim, the court thus would be
> required not simply to consider the individual sales on an individual
> basis, but to relate those sales to one of the conspiracy violations
> alleged by the plaintiffs. Confronted with this congeries of both
> separate allegations of conspiracy violations and individualized
> claims of injury and damages, all intertwined, the district judge found
> that, if he certified this action as a class action, the court would be
> swamped by an overwhelming deluge of mini-trials, in which the
> potential claimants would be entitled to a jury trial, and which would
> engage the time and attention of the court for years to come.  He gave
> consideration to severance of issues but found that the resulting
> dilemma could not be resolved by any severing of issues.

*Id.* at 67.   The Fourth Circuit then concluded, "[i]n view of the overwhelming nature of the individual claims and their complexity, he found, as we have said, that the issue of violation did not predominate nor was a class action a superior remedy in the case."  *Id.*

In *Broussard*, the Court found that "each putative class member's claim for lost profits damages was inherently individualized and thus not easily amenable to class treatment.  We have previously recognized that the need for individualized proof of damages bars class certification in some antitrust cases."  *Broussard,* 155 F.3d at 342-43.  The Fourth Circuit cited *Windham*, stating that there, "we held proof of damages was 'always strictly individualized,' and we invalidated 'generalized or class-wide proof of damages' because proof of actual, individual damages was a

-34-

critical element of a plaintiff's antitrust claim." *Id.* at 343.  The Court concluded that "[p]lainly plaintiffs' claim for lost profits damages was not a natural candidate for class-wide resolution; the calculation of lost profits is too 'dependent upon consideration of the unique circumstances pertinent to each class member.'" *Id. quoting Boley v. Brown,* 10 F.d3d 318, 223 (4th Cir. 1993).  The Fourth Circuit noted that the jury considered lost profits without looking at a variety of factors that would have affected the lost profits, including location and local economy.  *Id.*  The Court also noted that the "plaintiffs' expert based his lost profits testimony on abstract analysis of 'averages'" which included the average profit margin.  *Id.*  The *Broussard* Court found that the class was "no more than a hodgepodge of factually as well as legally different plaintiffs' that should not have been cobbled together for trial." *Id.* at 343 (citation omitted).  The Court explained that the plaintiffs' contractual rights and obligations were different, Defendant made different representations to each plaintiff, each plaintiff's entitlement to toll the statute of limitations was fact-dependent, and the profits lost by plaintiffs varied according to their individual business circumstances.  *Id.*  Plaintiffs' claims bear the same characteristics.

Other Issues

As with restraint on trade, Plaintiffs claims of unjust enrichment would similarly require individualized proof.  "A claim of unjust enrichment generally entails the establishment of three elements: (1) a benefit conferred upon the plaintiff, (2) an appreciation or knowledge by the defendant of such benefit, and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value." *Veolia Es Special Services, Inc. v. Techsol Chemical Co.,* No. 3:07-0153, 2007 WL 4255280 at *9 (S.D.W.Va. 2007) *citing* 26 Williston on Contracts § 68:5 (4th ed.).  The measure of

-35-

damages in an unjust enrichment claim is not lost profits, but rather the benefit conferred. Thus, the Court would need to consider the conduct of each individual defendant and each individual plaintiff to determine which defendant was unjustly enriched by which plaintiff.

Plaintiffs understate the complexity of their unjust enrichment claims against all defendants. At the hearing they took the position that the amount each defendant earned from the scheme could be calculated easily and then divided among the class members who were active in the market at that time. (Hr'g Tr. 24.) This approach is too general. The transactions occurred on numerous different occasions over a period of many years. Even if the amount of the illicit benefit to each defendant is easily ascertainable, dividing it among the class members would be a demanding exercise in individualized proof. Therefore, the unjust enrichment claim is not susceptible to class-wide proof.

Since the Court has found that both the vertical conspiracy claim and the unjust enrichment claim do not meet the predominance requirement, the Court finds that the contract claim also does not meet the predominance requirement. Both vertical conspiracy and unjust enrichment require consideration of individual factors, some of which overlap with the issues arising in the contracts claim. Because of these overlapping facts and law, the Court finds that the contract claims cannot meet the predominance requirement.

Another issue complicating the predominance requirement is the statute of limitations. The statute of limitations for antitrust claims is four years. *See GO Computer, Inc. v. Microsoft Corp.,* 508 F.3d 170, 173 (4th Cir. 2007). The statute of limitations for a claim of unjust enrichment is five years. W.Va. Code § 55-2-6. The statute of limitations for the breach of contract claim is ten years. W.Va. Code § 55-2-6. "[T]he record must affirmatively reveal that resolution of the statute of limitations defense on its merits may be accomplished on a class-wide basis." *Thorn,* 445 F.3d at

-36-

321.  This is Plaintiffs' burden to prove as part of their burden to show compliance with Rule 23. *Id.* at 322.

Plaintiffs argue that the 2000 FERC disgorgement order was the first event that put plaintiffs on notice of the scheme. While this may ultimately prove to be the case, the defendants cannot be precluded at this stage from offering evidence of an earlier trigger.  Since the transactions took place well before the FERC order, Defendants assert there may be plaintiff class members against whom the statute of limitations had run before the suit was filed.

The fact that different parties may or may not have known of the illegal scheme prior to the 2000 FERC order also indicates that there will be individual inquiry regarding equitable tolling of the statute of limitations.  The Supreme Court has indicated that the fraudulent concealment tolling doctrine – meaning that the statute of limitations does not begin to run until plaintiff discovers the fraud – applies in all federal statutes of limitation.  *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.,* 71 F.3d 119, 122 (4th Cir. 1995) *citing Holmberg v. Armbrecht,* 327 U.S. 392, 397 (1946).

> To invoke the doctrine in this circuit, a plaintiff in an antitrust action must satisfy each element of a three part test.  Specifically, a plaintiff must demonstrate (1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence.

*Supermarket of Marlinton,* 71 F.3d at 122 *citing Weinberger v. Retail Credit Co.,* 498 F.2d 522, 555 (4th Cir. 1974).  To determine whether Plaintiffs meet these requirements, the Court would need to engage in individual inquiry to resolve whether equitable tolling would be applicable.  The Court would have to determine which plaintiffs had information about the imbalance transactions prior to 2000; some plaintiffs may have known within the statutory period while others may not have been

alerted until the FERC disgorgement order.  The Court would also be required to look at each plaintiff to determine what actions it took to satisfy the due diligence requirement of equitable tolling – what it knew and the level of due diligence exercised.  These factors require individual inquiry and are not subject to class-wide proof.  Thus Plaintiffs here fail to show that the statute of limitations issue could be resolved on a class-wide basis.

**Superiority**

Defendants vigorously contest whether Plaintiffs can meet the superiority requirement, which focuses on the practicality of proceeding in a class-wide adjudication.  "A court's inquiry into superiority 'requires an understanding of the relevant claims, defenses, facts, and substantive law presented in the case.'"  *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 630-31 (5th Cir. 1999) (citation omitted).  "It is an abuse of discretion to certify a class without adequately considering 'how a trial on the alleged causes of action would be tried.'"  *Id.* at 631 (citation omitted).

The four factors listed in Rule 23(b)(3) that courts should consider in determining whether predominance is met are also considered when determining superiority.  The superiority requirement ensures that a class action is superior to other means of adjudicating the claims fairly and efficiently.  These factors provide an outline to ensure that the Court fairly acknowledges whether the class action is the superior method of pursuing a litigation.  The critical issue is the ability of the Court to manage the litigation if class action status is conferred.

Plaintiffs propose a class-wide trial to fix aggregate damages, which would then be divided among class members in subsequent proceedings.  However, the calculation of damages in this antitrust action is not so simple.  Here, the loss of profits sustained by each class member depends on a great variation in the circumstances.  With the fluctuations in the market for gas over time,

place, and other factors, the proof necessary to establish a loss of profits is not a mechanical or simple mathematical calculation. Any damages awarded to a particular class member would have to be attributed to a specific conspiracy, not to the whole group of separate vertical conspiracies.

In *Windham*, the district court had determined that if certified as a class action, the action would become unmanageable, citing the complexity of proof of injury and damages. The appeals court found ample justification for the lower court's finding on superiority. Among other reasons, the necessity of individualized trials for proof of injury and damages in the context of antitrust claims would cause "an overwhelming deluge of mini-trials." *Windham,* 565 F.2d at 67. The Fourth Circuit explained the distinguishing features, in antitrust actions, on which predominance and superiority decisions rest. Where the fact of injury and damages may be characterized as a mechanical task or mathematic calculation, class treatment may be appropriate. But where damages and impact are so not easily calculated or demonstrated by common proof, thus requiring separate mini-trials, the purposes of Rule 23 cannot be met. *Windham,* 565 F.2d at 68. The Fourth Circuit later addressed this problem in *Thorn*. In that case the "manageability problems at trial" provided compelling reason for the denial of class action status. *Thorn,* 445 F.3d at 328. Individual hearings on matters such as the statute of limitations defense and each class member's damages reduced the efficiency of a class-wide trial.

The Court finds that determining liability for each vertical conspiracy, then calculating damages attributable to each, and then fixing the amount of each class member's loss are intertwined and overlapping. Should the Court adopt Plaintiffs' proposal, then the proof required at each class member's individual trial would replicate the evidence relied upon in the prior class-wide liability trial in order to support the individual damage claims. Given the individual inquiries required and

the individual damages, the members of the class have a strong incentive to pursue separate litigations so that they can control the litigation themselves. Some of the plaintiffs are no longer in business, some were in business for longer lengths of time than others, and others were positively impacted by certain alleged actions of the defendants. There is a wide range of geographical locations where these alleged adverse impacts took place. The management of such a class action is likely to become unwieldy given the individual questions of fact that will arise regarding the nature and terms of each contract, the location and nature of each transaction, and the potential adverse impact to each other plaintiff – as well as whether such impact was illegal or not.

The Court finds that these complications with the case would make the entire litigation unmanageable as a class action. Thus, even if there are commonalities among the contracts claims, it would be inefficient to certify them separately. If the Court certified class status for the breach of contract claim, the evidence would clearly duplicate the proof of the vertical conspiracy claims and the unjust enrichment claims. To do this would be inefficient in the extreme.

Plaintiffs have not established that their class action proposal is the superior method for deciding these claims. A class-wide trial on liability would accomplish little and risk substantial confusion. The jury would have to consider each vertical conspiracy separately, a daunting task given the number of conspiracies and their variations in time and location. Even if the Court accepted Plaintiffs' theory that class-wide aggregate damages could be determined, dividing those damages in a subsequent proceeding would be virtually impossible. Every class member would have highly individualized proof to pinpoint the conspiracy responsible for its loss and the amount of damages. Even though the class membership is in the hundreds, and comparatively small when viewed against many other class actions, the task would overwhelm any district court.

Additionally, if Plaintiffs' claims are meritorious, the defendants would be liable for millions of dollars in damages. The putative class consists of corporations engaged in the marketing of natural gas, a relatively specialized endeavor in a complex marketplace. Plaintiffs have not convinced the Court that these entities could not maintain their own claims.

## CONCLUSION

For the reasons above, the Court **DENIES** Plaintiffs' Renewed Motion for Class Certification, Appointment of Class Representatives, Appointment of Class Counsel, and Approval of Notice of Class Action (Doc. 678). The Court also **DENIES as moot** Defendant's Motion to Exclude Testimony of Plaintiffs' Class Certification Expert (Doc. 698).

The Court **DIRECTS** the Clerk to send a copy of this written Order and Opinion to counsel of record and any unrepresented parties.


DATE:  August 19, 2008


ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE


-41-